**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| YAROSLAVA KALSKI,<br><br>              Plaintiff,<br><br>    v.<br><br>BRANDYWINE SENIOR LIVING, LLC, *et al.*,<br><br>              Defendants. | Civil Action No. 22-4484 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

    This matter comes before the Court on Defendants Brandywine Senior Living, LLC, Brandywine Senior Living Management, LLC, Brandywine Senior Living at Mahwah, LLC (collectively, the "Brandywine Defendants"), and BL Manager, LLC's ("BL Manager," and together with the Brandywine Defendants, "Defendants") Motion to Dismiss for Insufficient Service of Process[1] and for Failure to State a Claim Pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6). (ECF No. 8.) Plaintiff Yaroslava Kalski ("Kalski") opposed Defendants' Motion to Dismiss (ECF No. 9), and Defendants did not reply. The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court denies Defendants' Motion to Dismiss.

---

[1] BL Manager waived service in this action on its own prerogative (ECF No. 7); the Brandywine Defendants did not do so, however, and, as a result, separately move to dismiss for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5). (Defs.' Moving Br. 9-10, ECF No. 8-1.)

I.  **BACKGROUND**

This case is about an employer's response to an employee's diagnosis of COVID-19. (*See generally* Am. Compl., ECF No. 5.) Until June 2020, Kalski worked as a Licensed Practical Nurse at Brandywine Senior Living in Mahwah, New Jersey, and did so for over two years. (*Id.* ¶¶ 4, 14-15, 33.) Defendants own and operate multiple senior living facilities on the east coast of the United States, including the facility where Kalski worked. (*Id.* ¶¶ 4-7.)

This story begins, like it sadly did for thousands of other Americans, in April 2020, when Kalski was diagnosed with COVID-19. (*Id.* ¶ 18.) Initially, Defendants granted Kalski a two-week leave. (*Id.* ¶ 19.) But when Kalski's ongoing symptoms prevented her from returning to work at the end of the two weeks, Defendants decided that Kalski had resigned from her position, despite Kalski telling Director of Nursing Barbara Sbarra ("Sbarra") that she was still unwell. (*Id.* ¶¶ 17, 21-22.) Kalski and Defendants attempted to move on from that incident. Executive Director Mariola Koldys ("Koldys")—the Executive Director of Brandywine in Mahwah, New Jersey to whom Sbarra reported—subsequently contacted Kalski and allowed her to return to work, and Kalski did so at the beginning of May 2020. (*Id.* ¶¶ 17, 24-26.) From that point on, everything was business as usual—until Kalski made a vacation request in late May. (*See id.* ¶ 27.)

In response to Kalski's vacation request, Koldys allegedly made negative remarks regarding Kalski's April 2020 medical leave, "including[,] but not limited to[,] telling [Kalski] that everyone . . . had been working hard for the last month while she sat at home and that other people get sick for three days and then get better but [Kalski] was out of work for a month." (*Id.* ¶ 28.) Koldys also questioned whether Kalski was "sure" about wanting to take more time off. (*Id.*) Several days later, Kalski was called to Defendants' human resources ("HR") office, where she met with Koldys and Jessica Messina ("Messina"), the HR Manager. (*Id.* ¶¶ 30-31.) There, Koldys and Messina told

2

Kalski that Defendants received "an anonymous e[-]mail claiming that [Kalski] had allegedly abused a patient." (*Id.* ¶ 32.) No further information was provided to Kalski on that matter except that an investigation would be performed. (*Id.*) According to Kalski, that so-called investigation was a sham—Kalski was never interviewed. (*Id.* ¶¶ 32, 34.) Three days later, Kalski was terminated. (*Id.* ¶ 33.)

As part of Kalski's termination, Koldys and Messina told Kalski that: (1) she was being reported to the New Jersey Department of Health (the "Department"); (2) they could not disclose the reason for her termination; and (3) she would hear more from the Department on the allegations against her. (*Id.*) Kalski argues, however, that the Department did not receive a report from Defendants, and although Defendants conveyed to the New Jersey Department of Labor ("DOL") that Kalski was fired for "misconduct," Kalski ultimately received unemployment compensation benefits because "Defendants did not meet their burden of proof." (*Id.* ¶¶ 35-38.) Following her termination, Kalski unsuccessfully sought employment with other healthcare entities. (*Id.* ¶ 39.) It was not until April 2022 that Kalski was informed by a prospective employer that the New Jersey Division of Consumer Affairs ("Consumer Affairs") maintained allegations against her. (*Id.* ¶ 40.) Kalski contacted Consumer Affairs to obtain a copy of the report, but an employee there denied its existence. (*Id.* ¶ 41.) Kalski believes that Defendants retroactively filed a Health Care Professional Responsibility and Reporting Enhancement Act[2] Reporting Form (the "Report") pertaining to Kalski's alleged misconduct "almost two years after the alleged action that caused her termination (and presumably only . . . because [Consumer Affairs] contacted Defendants after speaking to [Kalski] in April of 2022. . .).” (*Id.* ¶¶ 42, 47.) After Consumer Affairs contacted Defendants, Kalski

---

[2] *See* "Health Care Professional Responsibility and Reporting Enhancement Act," 2 L. 2005, c. 83 (codified at N.J.S.A. 26:2H–12.2a to –12.2d, with amendments to other statutory provisions) (the "Cullen Act").

3

finally received the Report; she again contacted Consumer Affairs, at which point she discovered that it had only recently received the report from Defendants and that the Report was also sent to the Board of Nursing. (*Id.* ¶ 43.) The Report, dated June 12, 2020, communicated only that Kalski's termination was related to her "incompetency which relates adversely to patient care or safety." (*Id.* ¶ 44.) The Report also confirmed that Kalski never received a copy of the Report. (*Id.* ¶ 45.)

Kalski sued Defendants in New Jersey state court, and Defendants removed the action to federal court. (ECF No. 1.) As relevant here, Kalski's Amended Complaint alleges discrimination, hostile work environment, and retaliation in violation of the New Jersey Law Against Discrimination ("NJLAD") (*Count I*) and retaliation and interference under the Family and Medical Leave Act ("FMLA") (*Count II*), with a related defamation claim under New Jersey common law (*Count III*). (*See* Am. Compl. 9-13.) Based on the above events, Kalski alleges that during and after her FMLA-qualifying medical leave, also a reasonable employment accommodation under NJLAD, she was subject to "hostility and animosity by Defendants' management." (*Id.* ¶¶ 18-20.) At all relevant times, Sbarra and Koldys supervised Kalski. (*Id.* ¶ 17.)

The Brandywine Defendants now move to dismiss Kalski's Amended Complaint under Federal Rule of Civil Procedure12(b)(5) for insufficient service,[3] and, collectively, Defendants move to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. Defendants' Motion to Dismiss is ripe for resolution.

## II.  LEGAL STANDARD

### A.  Standard of Review for Failure to State a Claim

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the

---

[3] Hereinafter, all references to a "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

4

grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011), *as amended* (June 6, 2011). "First, the [C]ourt must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). On a motion to dismiss for failure to state a claim, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

    **B.**    **Standard of Review for Insufficient Service of Process**

A complaint may also be dismissed for insufficient service of process under Rule 12(b)(5). *Dimensional Commc'ns, Inc. v. OZ Optics Ltd.*, 218 F. Supp. 2d 653, 655 (D.N.J. 2002). The party responsible for service has the burden of demonstrating its validity when challenged. *Grand Ent.*

*Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993). In considering a motion to dismiss, a court can look to matters outside the pleadings. *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, No. 02-6030, 2006 WL 1084093, at *2 (D.N.J. Apr. 24, 2006). District courts possess broad discretion in deciding a motion to dismiss for insufficient service of process. *Manning v. Hudson County*, No. 17-3450, 2018 WL 3601228, at * 1 (D.N.J. July 27, 2018) (citing *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992)). If service was ineffective, a court may "dismiss the plaintiff's complaint . . . [or] simply quash service of process." *Umbenhauer*, 969 F.2d at 30. "[W]hen there exists a reasonable prospect that service may yet be obtained," dismissal is inappropriate and "the district court should, at most, quash service, leaving the plaintiff[] free to effect proper service." *Id.* (citations omitted); *see also Ramada Worldwide Inc. v. Shriji Krupa, LLC*, No. 07-2726, 2013 WL 1903295, at *6 (D.N.J. Apr. 17, 2013) (explaining that courts should be "reluctant" to dismiss an action where a plaintiff acted in good faith but failed to properly serve).

## III.  DISCUSSION

Defendants raise three main arguments in support of dismissal of the Amended Complaint: that (1) the Brandywine Defendants were not Kalski's "employer" under applicable law; (2) Kalski has not adequately pleaded malice, as required to maintain a defamation claim, and any information shared with prospective healthcare employers regarding her termination was required; and (3) Kalski has failed to properly serve the Brandywine Defendants. (*See* Defs.' Moving Br. 1-2.) The Court begins with whether the Brandywine Defendants are Kalski's employer, and then addresses Defendants' remaining arguments.

### A.  Motion to Dismiss for Failure to State a Claim

#### 1.  Kalski's NJLAD (*Count I*) and FMLA (*Count II*) Claims

To begin, the Brandywine Defendants contend that Kalski's claims should be dismissed because they are not her employer. (Defs.' Moving Br. 7-8.) Specifically, the Brandywine

Defendants assert that they had no part in Kalski's employment and point to Kalski's W-2 form and her DOL unemployment compensation as evidence that BL Manager alone is her employer. (*Id.*; *see* Williams Cert., Exs. A, B, ECF No. 8-3.) By contrast, Kalski proffers that the Brandywine Defendants are her employer under single and joint employer theories of liability and hence contends that, without the aid of discovery, she has stated enough to survive dismissal. (Pl.'s Opp'n Br. 12-19, ECF No. 9.)

Whether an employment relationship exists is usually a relatively simple inquiry, particularly when an employee has only one employer. In employment law, however, it is well-established that a plaintiff may have multiple employers. *See N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1121-24 (3d Cir. 1982) (explaining "single employer" and "joint employer" tests).[4] Even where a traditional employment relationship is lacking, the "single employer" and "joint employer" tests are applied in NJLAD and FMLA cases to determine whether an employment relationship exists and, if so, to subsequently assess liability. *Laurora v. Bayer HealthCare LLC*, No. 16-09041, 2018 WL 3586272, at *3-4 (D.N.J. July 26, 2018) (discussing tests under NJLAD); *Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 529-32 (considering tests under FMLA), *aff'd* 733 F. App'x 632 (3d Cir. 2018). "The 'joint employer' and 'single employer' concepts are distinct," and the Court discusses them in more detail below. *See Browning-Ferris Indus.*, 691 F.2d at 1122. Notwithstanding the context, a single employer exists when "two nominally independent enterprises, in reality, constitute only *one integrated*

---

[4] The Third Circuit has applied "single employer" and "joint employer" theories of liability in a wide variety of employment contexts, including in Fair Labor Standards Act ("FLSA"), Age Discrimination in Employment Act ("ADEA"), Americans with Disabilities Act ("ADA"), and Title VII cases. *E.g.*, *In re Enter. Rent-A-Car Wage & Hour Empl. Pracs. Litig.*, 683 F.3d 462 (3d Cir. 2012); *E.E.O.C. v. Zippo Mfg. Co.*, 713 F.2d 32 (3d Cir. 1983); *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177 (3d Cir. 2010); *Plaso v. IJKG, LLC*, 553 F. App'x 199 (3d Cir. 2014).

7

*enterprise.*" *Id.* at 1122 (emphasis in original); *see also Nesbit v. Gears Unltd., Inc.*, 347 F.3d 72, 84 (3d Cir. 2003). In contrast, the "joint employer" concept assumes that companies are "independent legal entities" that "chose[] to handle jointly . . . important aspects of their employer-employee relationship." *Browning-Ferris Indus.*, 691 F.2d at 1122 (citations omitted). Thus, though they may be separate, joint entities "share or co-determine those matters governing the essential terms and conditions of employment." *Id.* at 1123 (citations omitted) (emphasis omitted).

That said, "NJLAD generally require[s] an employment relationship to exist between a plaintiff and a defendant to hold said defendant liable for acts of discrimination." *Galarza v. Whittle-Kinard*, No. 16-0764, 2017 WL 4329733, at *10 (D.N.J. Sept. 29, 2017) (alterations in original); *see Alston v. Monmouth Cnty. Prosecutor's Office*, No. 12-5633, 2014 WL 1095716, at *8 (citing *Pukowsky v. Caruso*, 711 A.2d 398, 404 (N.J. Super. Ct. App. Div. 1998)). To prove the existence of an employment relationship under a "joint employer" theory pursuant to NJLAD, courts employ a twelve-factor test:

> [(1)] the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation-supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the employer; (10) whether the worker accrues retirement benefits; (11) whether the employer pays social security taxes; and (12) the intention of the parties.

*Alston*, 2014 WL 1095716, at *8 (internal quotations and citation omitted). On the other hand, a plaintiff using the "single employer" test to prove an employment relationship pursuant to NJLAD must show that the "operations of the companies are so united that . . . employees of one company are treated interchangeably with those of another." *Bayer HealthCare LLC*, 2018 WL 3586272, at *4 (citing *Nesbit*, 347 F.3d at 87). Relevant factors under the "single employer" inquiry include:

(1) the degree of unity concerning ownership, management, and function; (2) whether third parties view the entities as a single company; (3) whether a parent company is responsible for salaries, expenses, or losses; and (4) whether one entity conducts business exclusively with the other. *Nesbit*, 347 F.2d at 87-88.

FMLA liability also requires a plaintiff to show that a defendant is an employer subject to the requirements of the statute. *Galarza*, 2017 WL 4329733, at *11. Yet the FMLA has its own separate multi-factor "joint employer" test. *Bayer HealthCare LLC*, 2018 WL 3586272, at *4. A joint employer relationship generally exists under the FMLA where: (1) employers agree to interchange employees or share employee services; (2) one employer acts, directly or indirectly, in the interests of the other employer; or (3) employers appear to share control of the employee, directly or indirectly. *Carroll v. Sunrise Detox Cherry Hill*, No. 19-17287, 2020 WL 4218409, at *5 (D.N.J. July 22, 2020) (quoting 29 C.F.R. § 825.106(a)(1)-(3)). Similar to the "single employer" test under NJLAD, the FMLA test examines: (1) interrelation of operations; (2) common management; (3) centralized labor relations; and (4) common ownership or control. *CPR Restoration & Cleaning Servs.*, 200 F. Supp. 3d at 529; *see also Spalla v. Mfg. Servs. Grp., Inc.*, No. 16-821, 2017 WL 569178, at *5 (M.D. Pa. Feb. 13, 2017).

The Amended Complaint describes the Brandywine Defendants as owning and operating several senior living facilities on the east coast, including the facility where Kalski worked, and describes BL Manager as the owner and operator of those Brandywine entities. (Am. Compl. ¶¶ 4-7.) The Amended Complaint further provides that "Defendants are referred to interchangeably by employees and the public," maintain central management, and operate "various branches or divisions in numerous locations." (*Id.* ¶ 9.) In support of that proposition, Kalski claims that she "observed documentation" referring to Defendants interchangeably and that Defendants' website

9

"holds [Defendants] out as a unified business enterprise."[5] (*Id.* ¶ 10.) Based on this information, Kalski concludes that the Brandywine Defendants and BL Manager have an "interrelation of operations, common ownership or management, centralized control of labor relations, common financial controls, and other factors," so they are "sufficiently interrelated and integrated . . . [such] that they may be treated as a single and/or joint employer of [Kalski] for purposes of this instant action." (Am. Compl. ¶ 8; *see* Pl.'s Opp'n Br. 15-16.)

At this stage of the litigation, the Court agrees with Kalski. Whether an employment relationship exists "can only be established by a careful factual inquiry." *Washington v. Client Network Servs. Inc.*, 590 F. App'x 126, 129-30 (3d Cir. 2014) (citing *Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997)). And the issue "may generally require resolution at the summary judgment stage, rather than the motion to dismiss stage." *Id.* at 130 (citing *Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 768 n.5 (3d Cir. 2013)). As it relates to Kalski, the alleged discriminatory and retaliatory interactions involved "Defendants' high-level management," including Koldys and Messina. (*See* Am. Compl. ¶¶ 11, 17-35.) Kalski communicated with Koldys regarding employment-related matters, such as medical leave, returning to work, vacation time, and termination. (*Id.* ¶¶ 22-33.) The Brandywine Defendants contend that they "had no part in the decisions surrounding [Kalski's] employment," yet as discussed, Koldys and Messina, employees of the Brandywine Defendants, were responsible for terminating Kalski's employment. (*Id.* ¶ 33;

---

[5] Also attached to Kalski's Opposition Brief are the "LinkedIn.com" profiles of Koldys and Messina and print-out images of Defendants' website. (*See* Pl.'s Opp'n Br. Ex. B, ECF No. 9-2.) "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations and citations omitted) (emphasis in original). Noticeably, there is no mention of the LinkedIn.com profiles in Kalski's Amended Complaint; thus, the Court declines to consider them. The Court, however, takes into consideration Defendants' website, which the Amended Complaint does rely upon. (Am. Compl. ¶ 10.)

Defs.' Moving Br. 8.) Construing all facts and inferences in the light most favorable to Kalski, the Court finds that she has, at this stage of the litigation, pleaded sufficient facts to demonstrate that the Brandywine Defendants are her employer and may proceed to discovery to prove the viability of her claims.

### 2. Kalski's Defamation Claim (*Count III*)

Count III of Kalski's Amended Complaint alleges defamation under New Jersey common law. (Am. Compl. ¶¶ 70-82.) This claim is based on the disclosures, described above, that Defendants allegedly made to prospective employers and Consumer Affairs concerning Kalski's termination. (Defs.' Moving Br. 10-13; Am. Compl. ¶¶ 70-82.) Defendants submit that portions of the Cullen Act insulate them from liability and that Kalski has not adequately pleaded malice regarding their Report. (Defs.' Moving Br. 10-13.) Kalski counters that the Cullen Act does not immunize false or malicious reporting and further maintains that Defendants failed to meet several statutory requirements, such as the timeliness of the Report and the requirement to provide Kalski with a copy of the performance evaluation that Defendants shared with others. (Pl.'s Opp'n Br. 19-24.)

To sufficiently state her defamation claim, Kalski must adequately allege: (1) that Defendants made a false and defamatory statement concerning her; (2) that the statement was communicated to a third party and not privileged; and (3) when the plaintiff is a private individual, fault that amounts to negligence. *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204, 206-07 (D.N.J. 2011) (citing *Singer v. Beach Trading Co.*, 876 A.2d 885, 894-95 (N.J. Super. Ct. App. Div. 2005)).

In relevant part, the Cullen Act obligates health care entities to report information to Consumer Affairs if, "for reasons relating to the health care professional's impairment, incompetency, or professional misconduct, which incompetency or professional misconduct relates

adversely to patient care or safety," a health care worker has privileges revoked or suspended or is "discharged from the staff" at the "health care entity." *Alexander v. Hackensack Meridian Health*, No. 19-18287, 2020 WL 5810526, at *11 (D.N.J. Sept. 30, 2020) (quoting N.J.S.A. § 26:2H-12.2b(a)(1)). This reporting "shall be made within seven days of the date of the action, settlement, judgment, or award." N.J.S.A. 26:2H-12.2(b)(e). Notice of the reporting must also be provided to the health care professional who is the subject of the notice. *Id.* at 26:2H-12.2(h). Moreover, information about a current or former employee's job performance can be provided to another health care entity only if: (1) a signed performance evaluation has been shared with the employee; (2) the employee was provided an opportunity to respond; and (3) the employee's response was considered when providing the information to another health care entity. N.J.S.A. 12:2H-12.2(c). The immunity provision of the Cullen Act further provides that a health care entity reporting to Consumer Affairs or to "another health care entity concerning a health care professional, including information about a current or former employee's job performance as it relates to patient care, is not liable for civil damages in any cause of action arising out of the provision or reporting of the information." *Senisch v. Carlino*, 32 A.2d 217, 280 (N.J. Super. Ct. App. Div. 2011) (quoting N.J.S.A. 26:2H-12.2(c)). The protections do not necessarily apply where the reporting was made in "bad faith or with malice." *Id.* at 281.

Here, the Court finds that Kalski has adequately stated a defamation claim. Kalski alleges that the bases for her termination as provided in the Report—that she "was involved in an incident at [Defendants'] facility wherein she showed incompetency relating adversely to patient care or safety"—were false, and that Defendants knew such statements to be untrue but were intending to harm her reputation. (Am. Compl. ¶¶ 75-79.) In turn, Kalski alleges that the real reason Defendants terminated her was because of her COVID-19 leave. (*Id.* ¶¶ 21-23.) Putting forward more support

for this theory, as the Court explained above, Kalski remains uninformed as to the allegations that formed the basis for her termination and further alleges that the DOL awarded her unemployment compensation after Defendants failed to meet their burden of proof for their claim that she was fired for misconduct. (*Id.* ¶¶ 32-38.) And Kalski believes that the Report was filed and post-dated nearly two years after Defendants terminated her. (*Id.* ¶¶ 40-44.) Thus, Kalski does not challenge the underlying determination made by Defendants about the reason for her termination but instead contends that Defendants knowingly submitted a false report. (*Id.* ¶¶ 71-74; *see also* Pl.'s Opp'n Br. 23-24.) Accepting Kalski's allegations as true, and without more factual discovery, "a reasonable inference can be made that the Report[] w[as] not made 'in good faith and without malice.'" *Alexander*, 2020 WL 5810526, at *13. As such, the Court denies Defendants' Motion to Dismiss Kalski's defamation claim based on the immunity afforded by the Cullen Act.

**B.      Motion to Dismiss for Insufficient Service of Process**

Finally, the Brandywine Defendants contend that service of process was improper because the employee served at Brandywine Senior Living in Mahwah, New Jersey, is neither "an officer or managing agent" authorized to receive service on their behalf. (Defs.' Moving Br. 5.) The Brandywine Defendants are limited liability corporations. (*See* Gershuny Cert. E-G, ECF No. 8-2.) As such, Kalski must abide by Rule 4(h), which governs service of process for corporations and unincorporated associations. *See* Fed. R. Civ. P. 4(h).[6] Service on limited liability corporations may be effectuated by: (1) following state law for serving a summons in the state where the district court is located or where service is made; or (2) "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or [] any other agent authorized by appointment or by

---

[6] Rule 4(h)(1)(A) provides that an entity may be served "in the manner prescribed by Rule 4(e)(1) . . . ." Fed. R. Civ. P. 4(h)(1)(A).

13

law." *Mettle v. First Union Nat. Bank*, 279 F. Supp. 2d. 598, 602 (D.N.J. 2003) (quoting Fed. R. Civ. P. 4(h)).

New Jersey allows for a limited liability corporation to be served through "an officer or managing agent." N.J. Ct. R. 4:4–4(a)(5); *Erwin v. Waller Cap. Partners, LLC*, No. 10-03283, 2010 WL 4053553, at * 5 (D.N.J. Oct. 14, 2010) ("The [New Jersey court rules] do not specifically use the word 'limited liability company' or address the impact of service upon this particular form of business organization. However, it is this Court's view that limited liability companies fall under the category of 'unincorporated associations' specified in N.J. Ct. R. 4:4–4(a)(5)."). Accordingly, Kalski has the burden of proving that the individual served, C. Bannister ("Bannister"), held a position of "managing or general agent," or an equivalent. *See Gottlieb v. Sandia Am. Corp.*, 452 F.2d 510, 513 (3d Cir. 1971).

Here, the Court finds that Kalski has not met her burden of proving Bannister's authorization to receive service of process for the Brandywine Defendants. The Brandywine Defendants point to the state court action affidavits of service as evidence that neither their correct address nor agent have been served in this action. (*See* Defs.' Moving Br. 9-10; Gershuny Cert., Exs. B-G, ECF No. 8-2 (corporate status reports for the Brandywine Defendants designating Brenda Bacon as the registered agent for those entities and a Mt. Laurel, New Jersey receipt address.).) In response, Kalski does not aver that Bannister is an officer or managing agent of Defendants or that Bannister was authorized to accept service. (*See* Pl.'s Opp'n Br. 11.) Instead, Kalski contends that Defendants' service of process argument is moot. (*Id.*)

The thrust of Kalski's mootness argument involves e-mail exchanges between her counsel, Allison Barker, Esq. ("Barker"), and counsel for Defendants, Lauren Gershuny, Esq. ("Gershuny"). By way of brief background, Defendants moved to dismiss Kalski's original complaint—which

14

Kalski first filed in state court—in July 2022, raising the same arguments, including insufficient service of process. (*See generally* Defs.' July 2022 Mot. to Dismiss, ECF No. 4.) Thereafter, Kalski filed her Amended Complaint. (ECF No. 5.) When the Brandywine Defendants again raised the service of process issue in their present Motion, it came as a surprise to Barker, who was under the impression that Gershuny's firm, Genova Burns, "ha[d] accepted service on behalf of the[] [Brandywine] Defendants." (*See* Pl.'s Moving Br., Ex. A, ECF No. 9-1.) In Barker's August 2022 e-mail to Gershuny expressing this surprise, Barker sought to clear up the issue of service and asked Gershuny to confirm whether she would accept service of the Amended Complaint on behalf of the Brandywine Defendants. (*Id.*) She also stated that if Gershuny would not accept service, she would re-serve them, but thought it to be a waste of resources. (*Id.*) Gershuny responded and "agree[d] to accept service on [the Brandywine Defendants]" behalf, but at the same time disagreed with Kalski's "position regarding maintaining the action against [the Brandywine Defendants], . . . reserv[ing] all rights with respect to the same." (*Id.*) Based on that e-mail, Kalski contends that the issue regarding service is "moot." (Pl.'s Opp'n Br. 11.) To be clear, Gershuny never signed an acceptance of the service of summons for the Brandywine Defendants.

The question becomes whether the Brandywine Defendants waived service of process. *First*, although New Jersey law provides that "[a] general appearance or an acceptance of the service of a summons, signed by the defendant's attorney . . . shall have the same effect as if the defendant had been properly served," that rule is construed narrowly, to Kalski's detriment. *See Adv. Surgery Ctr. v. Conn. Gen. Life Ins. Co.*, No. 12-2715, 2012 WL 3598815, at *14 (D.N.J. July 31, 2022) (quoting N.J. Ct. R. 4:4-6). *Second*, and fatal to Kalski's argument, is Third Circuit case law holding that e-mail messages "evincing an intent to forego an objection to formal service . . . [are] insufficient to constitute a waiver of service." *See Di Loreto v. Costigan*, 351 F. App'x 747, 753

(3d Cir. 2009). In the particularly instructive case *Di Loreto*, a pro se defendant e-mailed the plaintiff's counsel, acknowledged service of the complaints, and expressed a clear intent to formally waive service. *Id.* at 750 ("Be advised that I will be appearing *pro se* in the cases and that I acknowledge service of both complaints effective today. I [sic] you require something more formal, just send it to me."). The *Di Loreto* court found that the plaintiff's intent was insufficient to forego objection to the defective service with the court. *Id.* at 752-53. Rather, defense counsel waives service only upon submission of a completed acceptance of service form to the court. *Id.* Thus, because Gershuny's "behavior was directed at plaintiff's counsel, and not at the court itself . . . it was insufficient to waive service." *Id.* (citing *Cmiech v. Electrolux Home Prods., Inc.*, 520 F. Supp. 2d 671, 675 (M.D. Pa. 2007) (explaining that even where defense counsel shows an intent to forego service, that behavior "f[a]ll[s] short of submitting to the jurisdiction of the court, and thus actually waiving any such objection" to service) (internal quotations and citations omitted) (alterations adopted)).

In any event, however, the Court does not wish "to make the service of process more difficult, time consuming, and expensive for plaintiff." *Mercedez-Benz Fin. Servs. USA LLC v. Chandler*, 19-15716, 2020 WL 3892360, at *5 (D.N.J. July 2, 2020). As detailed above, because there is nothing in the record that suggests Kalski would be unable to serve the Brandywine Defendants, dismissal of the Amended Complaint would be inappropriate at this time. *See Bright v. Tyson*, No. 15-8038, 2016 WL 3219876, at * 2 (D.N.J. June 6, 2016) (explaining that where a plaintiff acts in good faith yet fails to effect proper service of process, "courts are reluctant to dismiss an action"). Kalski served Defendants, albeit unsuccessfully, within the ninety-day period proscribed by Rule 4(m) and in good faith sought to clarify the insufficient service of process issue with counsel for the Brandywine Defendants in August 2022, well before the Rule 4(m) deadline.

(*See* Gershuny Cert., Exs. B-D; Pl.'s Opp'n Br., Ex. A.)[7] Kalski first filed her complaint in state court on June 8, 2022, attempted service several days later, and Defendants moved to dismiss less than a month later; thus, it is clear that the Rule 4(m) deadline had not yet expired at the time Defendants first moved to dismiss. (*See* Defs.' Not. of Removal 2, ECF No. 1; Gershuny Cert., Exs. B-D.) Therefore, "there exists a reasonable prospect that service may yet be obtained," and dismissal of Kalski's Amended Complaint with respect to the Brandywine Defendants would be improper. *See Umbenhauer*, 969 F.2d at 30. "Instead, the Court will quash service, strike the entry of service from the docket, and grant [Kalski] a short extension to effect proper service." *Manning*, 2018 WL 3601228, at *3 (citing *Umbenhauer*, 969 F.2d at 30). In the alternative, the Brandywine Defendants may forego any challenge to the defective service by returning an acceptance of service form to the court. *See Di Loreto*, 351 F. App'x at 753.

## IV. CONCLUSION

For the reasons stated above, the Court denies Defendants' Motion to Dismiss. Within thirty days of the date of this Memorandum Opinion, and in accordance with the Rules, Kalski must effectuate proper service of the Amended Complaint and summons upon the Brandywine Defendants. An appropriate Order accompanies this Memorandum Opinion.

*/s/ Michael A. Shipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[7] Under Rule 4(m), a plaintiff must effectuate service within ninety days after the complaint is filed. Fed. R. Civ. P. 4(m). Failing to meet this deadline results in dismissal of the action without prejudice. *See id.* "But if the plaintiff shows good cause for the failure, the [C]ourt must extend the time for service for an appropriate period." *Id.*; *see also Ramada Worldwide Inc.*, 2013 WL 1903295, at *6 ("Where a plaintiff acts in good faith, but fails to effect proper service of process, courts are reluctant to dismiss an action.").